**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Advanced Reimbursement Solutions LLC,<br><br>Plaintiff,<br><br>v.<br><br>Spring Excellence Surgical Hospital LLC, et al.,<br><br>Defendants. | No. CV-17-01688-PHX-DWL<br><br>**ORDER** |

## INTRODUCTION

Defendant Spring Excellence Surgical Hospital LLC ("SESH") contends it is not bound by the contract at issue in this lawsuit, the "Exclusive Healthcare 'Out of Network' Claims Billing Agreement" (the "Billing Agreement"), because the manager who executed the Billing Agreement on SESH's behalf, Joanna Davis ("Davis"), lacked authority to do so. SESH also claims that even if the Billing Agreement were a valid contract, it is not liable because Plaintiff Advanced Reimbursement Solutions LLC ("ARS") breached the Billing Agreement first.

ARS has moved for partial summary judgment on the issue of liability, contending that SESH is bound by the Billing Agreement for three reasons: (1) Davis had actual authority to enter into the Billing Agreement on SESH's behalf under Arizona agency law; (2) Davis executed the Billing Agreement as a manager of an LLC in the ordinary course of business, rendering SESH liable for its breach under Texas LLC law; and (3) SESH subsequently ratified the Billing Agreement. (Doc. 97.) ARS also disputes SESH's

argument that it breached the Billing Agreement. Alternatively, ARS seeks summary judgment on its unjust enrichment claim.[1]

For the following reasons, the Court grants partial summary judgment to ARS concerning its breach of contract claim and denies as moot ARS's motion for partial summary judgment concerning its claim for unjust enrichment.

## BACKGROUND

A. <u>The Parties</u>

ARS is a medical billing service that contracts with medical providers to process and bill out-of-network health insurance claims. (Doc. 98 ¶ 5; Doc. 98-2 at 49.)

SESH, a surgical hospital, is an LLC formed pursuant to the Texas Business Organizations Code. (Doc. 98 ¶ 6; Doc. 98-2 at 52.) SESH is a manager-managed LLC. (Doc. 98 ¶ 7; Doc. 98-2 at 52.) When it was formed, SESH's sole manager was Excellence Medical Group, LLC ("EMG"). (Doc. 98 ¶ 8; Doc. 98-2 at 55.)

SESH's Company Agreement, which became effective in June 2016, provided that SESH would have up to three managers. (Doc. 98 ¶ 9; Doc. 98-1 at 18.) In August and September 2016, these managers were Davis, Devorshia Janell Russell ("Russell"), and Dr. Richard Francis ("Francis"). (Doc. 98 ¶ 11; Doc. 98-2 at 56.)

SESH's Company Agreement provides that "the business and affairs of the Company shall be managed by the managers of the Company" and requires that all decisions required or permitted to be made by the managers "be agreed upon by a Majority vote of the Managers." (Doc. 98 ¶ 12; Doc. 98-1 at 17.)

B. <u>The Negotiation And Execution Of The Billing Agreement</u>

In or around July or August 2016, Jeffrey Webb ("Webb"), ARS's National Director of Sales, learned that SESH might be interested in ARS's billing services and was referred to Davis. (Doc. 98 ¶¶ 13-14; Doc. 98-3 at 11-12.) During Webb's initial phone call with Davis, Davis represented that she had an ownership interest in SESH and that she handled

---

[1] ARS has requested oral argument, but the Court will deny the request because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

SESH's day-to-day management. (Doc. 98 ¶ 15; Doc. 98-3 at 12.)

Webb requested that SESH execute a Mutual Non-Disclosure Agreement and Business Associates Agreement. (Doc. 98 ¶ 16; Doc. 98-3 at 12.) Davis executed the former as CEO on behalf of EMG and the latter as CEO on behalf of SESH. (Doc. 98 ¶¶ 17-18; Doc. 98-2 at 61; Doc. 98-3 at 15-29.)

Webb later made a presentation to SESH's management team during which Davis, Russell, and Francis were present. (Doc. 98 ¶¶ 19-20, Doc. 98-2 at 61.) Following Webb's presentation, Webb communicated with Davis to negotiate the terms of the Billing Agreement. (Doc. 98 ¶ 21; Doc. 98-2 at 61.)

On or about August 31, 2016, SESH's governing board held a board meeting at which Davis, Russell, Francis, and two other SESH affiliates were present. (Doc. 98 ¶ 22; Doc. 98-2 at 61; Doc. 98-3 at 31-34.) The minutes of the meeting indicate that SESH was in the process of searching for a full-time CEO and that the attendees unanimously approved that Russell and Davis would "work together to handle the day-to-day operations, functions, and administrative oversight of the CEO for SESH." (Doc. 98-3 at 31.)

The August meeting minutes do not mention the Billing Agreement. However, Davis states in her affidavit that, during the August 31, 2016 meeting, "SESH's board members . . . unanimously agreed to proceed moving forward with the Billing Agreement with no additions or deletions." (Doc. 98-2 at 62.) Russell similarly states in her affidavit that she and Francis authorized Davis to execute the Billing Agreement. (Doc. 98-3 at 9.)

Dr. Yueh Bryan Lee ("Lee") and Dr. Sherman Nagler ("Nagler"), who were affiliated with EMG members, have indicated in affidavits that they do not recall ever seeing, discussing, or voting on a copy of any billing agreement between ARS and SESH. (Doc. 211 at 22, 26-27.) Although these individuals indicated in their affidavits that they "attended scheduled meetings of EMG which included reviewing SESH business," they did not specify which meetings they attended. (*Id.* at 22, 26.)

The Billing Agreement indicates that it was signed by Davis as CEO of SESH on September 1, 2016 and by ARS's president on September 6, 2016. (Doc. 98-4 at 15-26;

*see also* Doc. 98-2 at 62.) The Billing Agreement includes a provision in which the signatories represent and warrant that they have authority to execute the agreement on behalf of their respective companies. (Doc. 98-4 at 23.)

The Billing Agreement provides that ARS will bill SESH monthly and that payment will be due from SESH no later than 10 business days after the date of invoice. (Doc. 98-4 at 18.) Additionally, it provides that if SESH fails to remit payment within the specified time limits, ARS is permitted to "immediately suspend provision of all Services" and SESH will be charged a late fee. (*Id.* at 18-19.) Substantively, the Billing Agreement grants ARS exclusive collection rights for out-of-network billings. (*Id.* at 15.) ARS is not obligated to verify that invoices submitted for collection reflect services performed at SESH.

C. <u>The September 2016 Board Meeting</u>

SESH's governing board held another meeting on September 26, 2016 at which Davis, Russell, and Francis were present. (Doc. 98 ¶ 31; Doc. 98-2 at 62; Doc. 98-3 at 36-38.) The minutes from the September meeting indicate that the governing board unanimously approved Russell and Davis to continue working together as SESH's CEO to handle the day-to-day management and operations. (Doc. 98-3 at 36.) Additionally, in the row for "Review of Current Contract & Agreements," the September minutes note: "See Manual/Binder -for New Contracts and agreement for SESH/SEM Agreements. ***All contracts initiated on behalf of SEM/SESH approved***." (*Id.* at 38, emphasis added.)

The September minutes do not indicate whether the Billing Agreement was among the contracts falling within this "approved" category. Dr. Mirza Baig ("Baig"), who is now a manager of and the custodian of records for SESH, states in an affidavit that he is "not aware of there ever being a vote of managers that approved any billing agreement between ARS and SESH." (Doc. 211 at 30.) However, Russell specifically states in her affidavit that the Billing Agreement was one of the contracts that was approved. (Doc. 98-3 at 8-9 ["During the September Meeting, . . . [t]he attendees also approved all contracts initiated on behalf of SESH, including ARS's Billing Agreement."]).

…

- 4 -

D. ARS's Performance Under The Billing Agreement

Following execution of the Billing Agreement, ARS began performing under the contract by collecting patient and medical services information from SESH via a secure computer system connection and preparing and filing medical claims for reimbursement with health insurance payers. (Doc. 98-2 at 49.) SESH began using ARS forms in September 2016. (Doc. 98 ¶ 45; Doc. 98-5 at 41-49.)

Between approximately December 1, 2016 and December 1, 2017, ARS sent invoices to ARS seeking a total of over $700,000 in compensation. (Doc. 98 ¶ 46; Doc. 98-6 at 2-15.) These invoices included EMG's address, not SESH's address. (Doc. 98-6 at 2-15.) SESH has never sent any money to ARS in response to these invoices. (Doc. 98 ¶ 47; Doc. 98-2 at 49.)

E. The Audit And Letters Concerning The Billing Agreement

Baig was involved in a due diligence review that was conducted when ABCD Technology, Inc. ("ABCD") was considering investing in SESH. (Doc. 211 at 30.) As part of that review, Baig reviewed numerous SESH documents, including SESH's accrual log. (*Id.*) SESH's accrual log did not include any invoices or amounts due to ARS before February 2017. (Doc. 211 at 30.)

After ABCD purchased an ownership stake in SESH, it conducted an audit of all claims processed by SESH. (*Id.*) Baig states in his affidavit: "The result of this audit found that in over 95% of the claims processed for SESH, ARS had performed them in a negligent and incompetent manner which resulted in inaccurate and incomplete claims." (*Id.*)

On February 23, 2017, Baig, SESH's then-interim CEO, sent a letter requesting that ARS "immediately cease and desist providing all billing and collections services for [SESH]." (Doc. 98-6 at 17-18.) The letter begins by noting that "[b]y way of background, ARS entered into an Exclusive Healthcare Out-Of-Network Claims Billing Agreement with SESH dated August 16, 2016." (*Id.* at 17.) The letter next asserts that "ARS began materially breaching the Agreement as early as the first month of the term of the Agreement," as "an independent audit of the claims processed by ARS under the

Agreement from the beginning of the Agreement through February 17, 2017 demonstrate[d] that ARS has failed to perform under its primary obligation under the Agreement at Section 1 in at least 95% of the claims it agreed to properly process under the Agreement." (*Id.*) The letter thus contends that the "ongoing material breach by ARS excuses SESH's performance under the agreement." (*Id.* at 18.)

On February 27, 2017, ARS sent a response letter demanding that SESH remit payment of the past-due amounts (at the time, over $125,000) by no later than March 10, 2017. (Doc. 98-6 at 20-22.) In this letter, ARS also disputed SESH's claim that it had breached the Billing Agreement and asserted that SESH's attempt to terminate the Billing Agreement did not comply with the Billing Agreement's termination provision. (*Id.*)

On March 23, 2017, SESH's counsel responded to ARS's letter by proposing a settlement offer and noting that the Billing Agreement "was executed and agreed to by the CEO of [EMG] without any agency or corporate authority to bind SESH to the terms of the agreement in question." (Doc. 98-6 at 24.)

**LEGAL STANDARD**

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable

inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**ANALYSIS**

A. <u>Breach of Contract</u>

    1. **Whether SESH Was Bound by the Billing Agreement**

In a breach of contract action, "the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013) (citation omitted). Here, the parties begin by disputing whether the Billing Agreement was a valid contract. ARS argues the Billing Agreement should be deemed valid for three reasons: (1) Davis had actual authority to execute the Billing Agreement on SESH's behalf under Arizona agency law; (2) Davis executed the Billing Agreement as a manager of an LLC in the ordinary course of business, rendering SESH liable for its breach under Texas LLC law; and (3) SESH subsequently ratified the Billing Agreement. (Doc. 97 at 10-16.) In response, SESH contends there was no valid contract because Davis lacked actual or apparent authority to bind SESH. (Doc. 211 at 6-12.)

The Court finds it unnecessary to resolve ARS's first and second arguments because it agrees with ARS's third argument. Even assuming, for the sake of argument, that Davis lacked the unilateral authority to bind SESH when she signed the Billing Agreement on September 1, 2016 and that Texas LLC law doesn't apply in the manner suggested by ARS, the undisputed evidence shows that SESH ratified the Billing Agreement during a board meeting on September 26, 2016.

"Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Fid. & Deposit Co. of Maryland v. Bondwriter Sw., Inc.*, 263 P.3d 633, 639 (Ariz. Ct. App. 2011) (quoting Restatement

(Second) of Agency § 82 (1958)). "Ratification recasts the legal relations between the principal and agent as they would have been had the agent acted with actual authority." *Id.* Thus, "[r]atification of a contract does not depend on the existence of an actual agency relationship at the time the contract is accepted." *Edwards v. Vemma Nutrition*, 2018 WL 637382, *3 (D. Ariz. 2018). Instead, "[r]atification requires intent to ratify plus full knowledge of all the material facts." *United Bank v. Mesa N. O. Nelson Co.*, 590 P.2d 1384, 1386 (Ariz. 1979). "Ratification may be express or implied, and intent may be inferred from the failure to repudiate an unauthorized act, from inaction, or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act." *Id.* (citations omitted).

Here, ARS has presented uncontroverted evidence of express ratification of the Billing Agreement.[2] Russell states in her affidavit that the attendees at the September 26, 2016 meeting, who included all three of SESH's managers at the time (Davis, Russell, and Francis), approved all contracts initiated on behalf of SESH, including the Billing Agreement. (Doc. 98-3 at 9.) Such approval constitutes express ratification, given that SESH's Company Agreement required that all decisions required or permitted to be made by the managers "be agreed upon by a Majority vote of the Managers." (Doc. 98-1 at 17.) Although SESH is correct that the minutes from the September 26, 2016 meeting do not explicitly state whether the Billing Agreement was among the group of contracts that was approved (Doc. 211 at 8), the minutes also don't contradict Russell's affidavit. The minutes simply provide that "[a]ll contracts initiated on behalf of SEM/SESH [were] approved," which is consistent with Russell's testimony that the Billing Agreement was one of those contracts (Doc. 98-3 at 38).

SESH seeks to dispute Russell's affidavit by deriding it as "self-serving." (Doc.

---

[2] In its motion, ARS argues that "Davis had actual authority to execute the Billing Agreement on SESH's behalf because all of SESH's managers approved the Billing Agreement." (Doc. 97 at 10.) ARS similarly argues in its reply that "[d]uring the September 26, 2016 meeting, the board approved all contracts that had been initiated on behalf of SESH, including the Billing Agreement." (Doc. 212 at 3.) Although ARS offers these arguments in the portions of its briefs addressing the issue of "actual authority," they are more properly understood as arguments concerning ratification.

- 8 -

211 at 8.) However, this isn't a valid objection when, as here, the affiant has personal knowledge of the matters at issue and describes them in a non-conclusory manner. *See, e.g.*, *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."); *Cadle Co. v Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("[T]he appellee's attempt to discount Hayes' affidavits as 'self-serving' misses the mark. A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.").

Finally, none of the other evidence submitted by SESH contradicts Russell's affidavit. The affidavits from Baig, Lee, and Nagler indicate only that these witnesses do not remember or were not aware of the Billing Agreement or voting on the Billing Agreement. It is unclear from their affidavits whether they even attended the September 26, 2016 meeting, and none of them affirmatively disputes Russell's claim that the Billing Agreement was approved during that meeting. *Cf. Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983) ("Posey's affidavit merely indicates that Posey never saw the ADEA notice, which is not the same as an averment that the notice was not in fact conspicuously posted. . . . Although it is true that a court should give to the party opposing a summary judgment motion the benefit of all reasonably drawn inferences, the mere possibility that a factual dispute may exist, without more, is an insufficient basis upon which to justify denial of a motion for summary judgment.") (citation omitted); *Chandler v. James*, 985 F. Supp. 1094, 1097 (M.D. Ala. 1997) ("[T]he court does not believe that it is under an obligation to assume for purposes of summary judgment that an event did not occur, when, in response to the allegations of the Plaintiff, the Defendants' witness states that he or she does not remember whether the event took place or not. The court does not believe that this is a showing sufficient to 'negate [the plaintiff's] claims' and demonstrate the existence of a material issue of fact.") (citation omitted); *Jones v. Fujitsu Network Commc'ns, Inc.*, 81 F. Supp. 2d 688, 692 (N.D. Tex. 1999) (finding that plaintiff attended meeting when "Plaintiff

state[d] in his affidavit that he d[id] not remember attending any such meeting, but offer[ed] no sworn statement that he did not attend a training session on October 7, 1994, or that the signature on the sign-in sheet was not his").[3]

2. **Whether SESH Can Avoid Liability Because ARS Breached First**

SESH alternatively argues that, even assuming the existence of a valid contract, "SESH would not be liable for a claim of breach of contract because ARS committed a first material breach. ARS failed to perform the billing services as soon as the first month of service." (Doc. 211 at 12.)

In Arizona, "a defendant who refuses to perform and is sued for breach of contract should be excused from liability if the plaintiff has personally failed in a material particular to perform the contract, although the defendant, at the time of his or her refusal to perform or continue performance, was ignorant of the plaintiff's prior breach." *QC Const. Prod., LLC v. Cohill's Bldg. Specialties, Inc.*, 423 F. Supp. 2d 1008, 1013 (D. Ariz. 2006) (citing Williston on Contracts § 43:12).

"Under Arizona law, a material breach occurs when (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions or (2) fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract." *Biltmore Bank of Arizona v. First Nat. Mortg. Sources, L.L.C.*, 2008 WL 564833, *6 (D. Ariz. 2008); *see also Snow v. W. Sav. &*

---

[3] In contrast, the Court disagrees with ARS's contention that SESH necessarily ratified the Billing Agreement through its conduct between September 2016 and March 2017—specifically, its decision to begin using of ARS's forms during this period, its receipt of over $4 million in claims reimbursements during this period, and its transmission of a letter to ARS in February 2017 that seemed to acknowledge the validity of the Billing Agreement. (Doc. 97 at 14-16.) Although a jury could view this evidence as proof of ratification, a jury would not be compelled to do so. An Arizona court has held that a party's acceptance of proceeds obtained via a contract is "not dispositive" of that party's intent to ratify the contract, particularly where the party "consistently protested the [contract] once he learned of the details." *Leroy v. Seattle Funding Grp. of Ariz., LLC*, 2012 WL 75644, *4-5 (Ariz. Ct. App. 2012). Here, although SESH seemed to acknowledge in Baig's February 2017 letter that the Billing Agreement was valid (Doc. 98-6 at 17 ["ARS entered into an Exclusive Healthcare Out-Of-Network Claims Billing Agreement with SESH dated August 16, 2016."]), that letter was sent around the same time that Baig was pursuing an audit of the ARS/SESH relationship. Thus, a jury could view that letter as an uninformed statement made without "full knowledge of all the material facts." *United Bank,* 590 P.2d at 1386.

*Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986) ("[A] breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract.") (citation omitted).

Here, the only evidence SESH proffers on this issue is Baig's statement in his affidavit that an audit conducted by ABCD "found that in over 95% of the claims processed for SESH, ARS had performed them in a negligent and incompetent manner which resulted in inaccurate and incomplete claims." (Doc. 211 at 30). Notably, SESH does not argue this alleged negligence constituted a breach of any express provision of the Billing Agreement. Instead, SESH contends it violated the contract's implied covenant of good faith and fair dealing. (Doc. 211 at 13-14.)

This argument is unavailing. As an initial matter, it is unclear whether, under Arizona law, a party to a contract may be excused from liability if the other party breaches the implied covenant of good faith and fair dealing. Nevertheless, even assuming so, SESH has not presented enough evidence of such a breach.

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.* A party may also breach the implied covenant if it "exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain." *Beaudry v. Ins. Co. of the W.*, 50 P.3d 836, 841 (Ariz. Ct. App. 2002) (citation omitted).

The single relevant line from Baig's affidavit is far too conclusory to create an issue of fact as to whether ARS breached the implied covenant of good faith and fair dealing. *See, e.g., F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); *Marks v. United States (Dept. of Justice)*, 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by

factual data will not create a triable issue of fact."); *Phillippi v. Kelso*, 2017 WL 3314934, *16 (N.D. Cal. 2017) (for summary judgment purposes, "[c]onclusions masquerading as facts are insufficient"). Baig states only that 95 percent of the claims were processed "in a negligent and incompetent manner" and this "resulted in inaccurate and incomplete claims." (Doc. 211 at 30). This statement does not make clear what exact benefits SESH did not receive under the contract, *Wells Fargo*, 38 P.3d at 28, or how SESH was denied the "reasonably expected benefit of the bargain." *Beaudry*, 40 P.3d at 841.

### 3. **Whether SESH Is Liable for Damages After April 23, 2017**

Finally, SESH argues that, assuming the existence of a valid contract, "SESH is not liable for any services provided by ARS after April 23, 2017" because it notified ARS of a material breach on February 23, 2017 and ARS failed to cure that breach within 60 days, which was the cure period specified in the Billing Agreement. (Doc. 211 at 14-15.)

This argument fails for two reasons. First, it is not properly before the Court. The only party that filed a motion for summary judgment is ARS. That motion, moreover, is a "partial" motion for summary judgment that seeks a determination that SESH is liable for breaching the Billing Agreement, not a determination as to the resulting amount of damages ARS is entitled to recover.[4] Thus, if SESH wished to use the summary judgment procedure to address a different issue—*i.e.,* the extent to which its damages should be capped—it should have filed its own motion.

Second, putting aside this procedural infirmity, the Court has already determined, in Section 2 above, that SESH failed to proffer sufficient evidence establishing that ARS materially breached the Billing Agreement. This determination undermines SESH's request for an April 23, 2017 damages cutoff, because the 60-day cure period in the Billing Agreement is only triggered by the presence of a material breach. Although SESH is free

---

[4] The caption of ARS's motion is "Motion For Partial Summary Judgment *Re: Liability* For Breach Of Contract Or, In The Alternative, Unjust Enrichment." (Doc. 97 at 1, emphasis added.) In its reply, ARS again asserts that it is seeking "summary judgment concerning SESH's *liability* for Count 1 (Breach of Contract)" and further explains that "[t]he Court should solely focus on the issue of liability because ARS only seeks summary judgment on SESH's liability for unjust enrichment. If SESH is found liable on Count 3, then ARS will establish its damages later." (Doc. 212 at 9-10, emphasis added.)

to attempt to establish its material breach theory at trial, and thereby attempt to limit the damages it owes, it is not entitled to such a ruling at the summary-judgment stage.

B.     Unjust Enrichment

Because the Court grants partial summary judgment to ARS on the issue of liability concerning its breach of contract claim, the Court denies as moot ARS's alternative motion for partial summary judgment on the issue of liability concerning its claim for unjust enrichment.

Accordingly, **IT IS ORDERED** that ARS's motion for partial summary judgment (Doc. 97) is granted as to liability on the breach of contract claim and denied as moot as to liability on the unjust enrichment claim.

Dated this 10th day of May, 2019.

_____
Dominic W. Lanza
United States District Judge