**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Advanced Reimbursement Solutions LLC, <br> Plaintiff, <br> v. <br> Spring Excellence Surgical Hospital LLC, <br> Defendant. | No. CV-17-01688-PHX-DWL <br><br> **ORDER** |

Pending before the Court is Plaintiff Advanced Reimbursement Solutions, LLC's ("ARS") motion for partial summary judgment on damages. (Doc. 224.) The Court previously held that Defendant Spring Excellence Surgical Hospital, LLC ("SESH") was liable to ARS for breach of contract. (Doc. 215.) For the following reasons, ARS's motion will be granted.

**BACKGROUND**

I. Factual Background

ARS is a medical billing service that contracts with medical providers to process and bill out-of-network insurance claims. (Doc. 98 ¶ 5; Doc. 98-2 at 49.) SESH owns and operates a hospital in Texas. (Doc. 98-1 at 10.) When it was formed, SESH's sole manager was Excellence Medical Group, LLC ("EMG"). (Doc. 98 ¶ 8; Doc. 98-2 at 55.)

ARS and SESH formed a valid contract—the Billing Agreement—no later than September 26, 2016.[1] (Doc. 215 at 7-8.) The Billing Agreement laid out the terms of the

---

[1] ARS, in its prior motion for partial summary judgment, argued that a contract could be found on three different grounds. (Doc. 215 at 7.) The Court found it unnecessary to

business relationship between the two parties. (Doc. 98-4 at 15-26.) The gist of the Billing Agreement was that ARS, the exclusive provider of out-of-network claims services for SESH, was to timely recover amounts owed to SESH by private health insurance providers in exchange for a cut of the amounts ARS recovered. (*Id*. at 15, 18.)

Specifically, the terms of the contract entitled ARS to 17.5% of reimbursements it helped recover for SESH from insurance providers, 25% of amounts SESH received following an appeal or redetermination, and costs incurred by ARS in performing its services. (*Id*. at 16, 18.) ARS was to bill SESH monthly and payment was due from SESH no later than ten business days after the date of invoice. (*Id*. at 18.) If SESH failed to remit payment within the specified time limits, ARS was permitted to charge SESH a late fee. (*Id.* at 18-19.) The late fee entitled ARS to (1) the greater of $150 or 10% of the amount overdue and (2) interest accruing at an annual rate of 18%. (*Id*.)

Following execution of the Billing Agreement, ARS began performing under the contract by collecting patient and medical services information from SESH via a secure computer system connection and preparing and filing medical claims for reimbursement with health insurance providers. (Doc. 98-2 at 49.) Between approximately December 1, 2016 and December 1, 2017, ARS sent invoices to SESH seeking a total of over $700,000 in compensation. (Doc. 98 ¶ 46; Doc. 98-6 at 2-15; Doc. 224-1 at 3-24.) The invoices attached to the earlier motion for partial summary judgment included EMG's address in Houston, Texas, but the invoices attached to the present motion include SESH's address in Spring, Texas. (*Compare* Doc. 98-6 at 2-15 *with* Doc. 224-1 at 3-24.) SESH has yet to send any money to ARS in response to these invoices. (Doc. 98 ¶ 47; Doc. 98-2 at 49.)

On February 23, 2017, Dr. Mirza Baig, SESH's then-interim CEO, sent a letter requesting that ARS "immediately cease and desist providing all billing and collections services for [SESH]." (Doc. 98-6 at 17-18.) The letter asserted that "ARS began materially breaching the Agreement as early as the first month of the term of the Agreement" and

---

address all three arguments, finding that SESH ratified the Billing Agreement at a board meeting on September 26, 2016. (*Id.*)

stated, in support of this assertion, that "an independent audit of the claims processed by ARS under the Agreement from the beginning of the Agreement through February 17, 2017 demonstrate[d] that ARS has failed to perform under its primary obligation under the Agreement at Section 1 in at least 95% of the claims it agreed to properly process under the Agreement." (*Id.*) The letter thus contended that the "ongoing material breach by ARS excuses SESH's performance under the agreement." (*Id.* at 18.) If ARS had, in fact, materially breached the Billing Agreement, the end date of the contract would have been April 23, 2017. (Doc. 98-4 at 19 [specifying that if ARS is in material breach of the contract, the Billing Agreement terminates at the end of the 60-day cure period].)

On February 27, 2017, ARS sent a response letter demanding that SESH remit payment of the past-due amounts (at the time, over $125,000) by no later than March 10, 2017. (Doc. 98-6 at 20-22.) In this letter, ARS also disputed SESH's claim that it had breached the Billing Agreement and asserted that SESH hadn't complied with the Billing Agreement's termination provision. (*Id.*)

On March 23, 2017, SESH's counsel responded to ARS's letter by proposing a settlement offer and noting that the Billing Agreement "was executed and agreed to by the CEO of [EMG] without any agency or corporate authority to bind SESH to the terms of the agreement in question." (Doc. 98-6 at 24.)

Notwithstanding the cease and desist letter and the settlement offer, ARS continued sending SESH invoices every month until December 2017. (Doc. 224-1 at 3-24.)[2]

As of May 31, 2019—the date ARS filed the pending motion—ARS claimed SESH owed $734,934.03 in unpaid principal, late fees of $73,493.41, and interest accruing at 18% annually. (Doc. 224 at 9.)

---

[2] ARS included, as an attachment to its present motion, an "Outstanding Claims Report" that purportedly shows that it stopped engaging in billing and claims processing activities on SESH's behalf by March 15, 2017. (Doc. 224-2 at 41-51; Doc. 224-3 at 1-13.) However, after SESH questioned the trustworthiness and admissibility of this document (Doc. 229 at 10-13), ARS made only a half-hearted attempt (in a footnote) to address those arguments, instead stating that the Court could rule in its favor without considering the Outstanding Claims Report. (Doc. 230 at 11 & n.6.) Accordingly, the Court will not consider the Outstanding Claims Report for purposes of its analysis here.

II. Procedural History

On May 31, 2017, ARS initiated this action by filing a complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, and, in the alternative, unjust enrichment. (Doc. 1.)[3]

On August 18, 2017, SESH filed an answer to the amended complaint. (Doc. 21.)

On June 8, 2018, ARS filed a motion for partial summary judgment limited to the issue of liability for breach of contract, or, in the alternative, unjust enrichment. (Doc. 97.)

On April 12, 2019, SESH filed a response to that motion. (Doc. 211.)

On April 26, 2019, ARS filed a reply to SESH's response. (Doc. 212.)

On May 10, 2019, the Court granted ARS's motion for partial summary judgment as to the liability of SESH on the breach of contract claim and denied the claim for unjust enrichment as moot. (Doc. 215.)

On May 31, 2019, ARS filed another motion for partial summary judgment limited to the measure of damages. (Doc. 224.)[4]

On July 8, 2019, SESH filed a response to that motion. (Doc. 229.)

On July 25, 2019, ARS filed a reply to SESH's response. (Doc. 230.)

On August 13, 2019, with leave of the Court, SESH filed a surreply. (Doc. 233.)

**DISCUSSION**

I. Legal Standard

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of

---

[3] This case was reassigned to the undersigned judge on October 31, 2018. (Doc. 169.)

[4] ARS requested oral argument, but that request will be denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id*. at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

II. <u>Admissibility Of Invoices</u>

To bring a breach of contract action under Arizona law, "the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013). The Court has already found that a contract existed between ARS and SESH and that SESH breached that contract. (Doc. 215 at 2.) ARS's current motion is limited to the measure of damages. (Doc. 224 at 4.)

ARS contends it is entitled to damages of $734,934.03 (plus interest and penalties)—a figure based on the commissions and expenses ARS contends it was owed under the Billing Agreement—and seeks to substantiate this claim by including, as exhibits

to its motion, the invoices it sent to SESH. (Doc. 224 at 4 [description of damages in motion]; Doc. 224-1 at 3-24 [invoices].) Additionally, ARS included, as an exhibit to its motion, an affidavit from Melissa Kohler, ARS's director of finance and accounting. (Doc. 224-1 at 26-28.) At the outset of the affidavit, Mrs. Kohler averred that "[t]he following facts are based upon my personal knowledge and of [ARS's] regularly maintained business records and business practices." (*Id.* ¶ 2.) Ms. Kohler then averred that the invoices attached to ARS's summary judgment motion were "[t]rue and correct copies" of the invoices that "ARS sent SESH." (*Id.* ¶ 10.)

In response, SESH argues that ARS failed to meet its initial burden of production under Rule 56—and therefore cannot prevail on its summary judgment motion—because "[t]he sole evidence upon which ARS relies to establish its overall claim for damages are ARS' own invoices. The ARS invoices, however, are patent inadmissible hearsay . . . [and] Ms. Kohler's affidavit does not provide the requisite foundation" under Rule 803(6) because "[n]owhere in Ms. Kohler's affidavit does she indicate that the ARS Invoices were 'made at or near the time by—or from information transmitted by—someone with knowledge' . . . . In addition, Ms. Kohler does not aver that the ARS Invoices were 'kept in the course of' ARS' business activities, or that creating the ARS Invoices was ARS' 'regular practice.'" (Doc. 229 at 3-4.) SESH also argues that, "[s]etting aside the foundational infirmities," the invoices "indicate a lack of trustworthiness under Rule 803(6)(E)" and "do not have circumstantial guarantees of trustworthiness under Rule 807" because they include a different mailing address for SESH than the invoices ARS attached to its previous summary judgment motion. (*Id.* at 6-7.)

In reply, ARS argues that the invoices attached to its motion are admissible business records as originally submitted and, for good measure, attaches an additional affidavit from Ms. Kohler to cure the alleged foundational defects. (Doc. 230 at 3-4; Doc. 230-1 at 3-4.)

In its surreply, SESH requests that the Court ignore the supplemental affidavit (while acknowledging that "it is certainly within the Court's prerogative to consider the Supplemental Affidavit") and reiterates its claim that the invoices are not trustworthy.

(Doc. 233 at 2-3.)

"A district court's ruling on a motion for summary judgment may only be based on admissible evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010). Here, SESH's position is that the invoices constitute inadmissible hearsay. Hearsay is a statement made out of court and offered in court to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is generally inadmissible unless an exception exists. Fed. R. Evid. 802.

The invoices at issue are written statements made out of court and offered for the truth of the matter they assert—that is, that SESH owes the amount of damages ARS claims. Thus, for the invoices to be admissible, ARS must show that an exception applies. *Oracle*, 627 F.3d at 385 (the "part[y] seeking admission . . . [bears] the burden of proof to show its admissibility"). The relevant exception is Rule 803(6), the so-called business records exception. Rule 803(6) "allows the admission of business records when two foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity." *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 819 (9th Cir. 2002) (internal quotation omitted).

SESH correctly points out that the affidavit ARS attached to its motion fails to establish these foundational elements. Although the affidavit makes clear that the affiant has personal knowledge of ARS's invoices and invoicing procedures and further notes that ARS regularly maintains at least some business records material to these invoices, it fails to establish that *these* invoices were made at or near the time of the activity by a person with knowledge or kept in the course of a regularly conducted activity. Nevertheless, the supplemental affidavit ARS attached to its reply cures these defects. This affidavit provides, in relevant part, that the invoices were "created at or near the date reflected as the 'Date' in the upper right hand corner of each of the individual invoices," "created by someone with knowledge of ARS's invoicing procedures," and "kept in the course of a regularly conducted activity of ARS's business and were created as part of ARS's regular

practice." (Doc. 230-1 at 4.)

The key question, then, is whether the Court can consider the supplemental affidavit. ARS contends that the supplemental affidavit is not "new" evidence, merely clarifies the foundation for the invoices, and is permissible under Federal Rule of Civil Procedure 56(e)(1). (Doc. 230 at 4 n.3.) SESH argues that the supplemental affidavit is new evidence and that ARS's submission of it as an attachment to a reply violated a Court Management Order that "[n]o evidence may be submitted with a reply." (Doc. 233 at 2-4, citing Doc. 189 at 6.)

The Court agrees with ARS and will consider the supplemental affidavit. In the Ninth Circuit, "where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (internal brackets omitted). Thus, even assuming the supplemental affidavit constitutes "new evidence," the Court complied with *Provenz* when it gave SESH the opportunity to file a surreply. (Doc. 232.) Additionally, Rule 56(e)(1) allows courts to provide parties with an opportunity "to properly support or address [a] fact" if they initially fail to do so, and SESH appears to concede that this rule applies to the supplemental affidavit. Other courts have noted that this rule "encourages decisions on the merits, not on technicalities." *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 2018 WL 6190348, *3 (C.D. Cal. 2018) (citation omitted).

Even the case SESH discusses at length in its response fails to support its position. In *Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.*, 317 F. Supp. 2d 373 (S.D.N.Y. 2004), the plaintiff submitted certain documents in support of its summary judgment motion but the accompanying affidavit "merely identif[ied] the relevant documents, without explaining whether they were kept in the ordinary course of business." *Id.* at 379. Although the district court recognized that this infirmity precluded it from considering the documents, it also "recognize[d] that this defect is rather technical." *Id.* Thus, "[i]n an effort to efficiently advance this litigation," the court "permit[ted] [the plaintiff] ten days

from the date of this Decision and Order to offer appropriate additional affidavits." *Id.* That, of course, is exactly what occurred here—after ARS became aware that its original affidavit was insufficient under Rule 803(6), it proffered a supplemental affidavit to cure the deficiency.

This leaves the matter of whether the invoices are trustworthy. Rule 803(6)(E) provides that the business records exception only applies if "the opponent does not show that the source of information or the circumstances of preparation indicate a lack of trustworthiness." SESH points to the fact that the invoices ARS submitted in support of its prior motion for summary judgment are not identical to the invoices attached to the present motion. (Doc. 229 at 7.) ARS responds that the only difference between the two sets of invoices (SESH's mailing address) is minor and that the numbers—the only component at issue in the present motion—are identical. (Doc. 230 at 5.) In its surreply, SESH disputes ARS's suggestion that the change in addresses is a "red herring." (Doc. 233 at 3-4.)

Neither party cites any case law that goes directly to the question of "trustworthiness" in the context of Rule 803(6)(E). SESH had the burden of persuasion on this point. *See* Fed. R. Evid. 803(6)(E) (stating that a business record is admissible if the "*opponent* does not show . . . a lack of trustworthiness") (emphasis added). "The basis for the business record exception is that accuracy is assured because the maker of the record relies on the record in the ordinary course of business activities." *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir. 1981). Thus, courts usually reserve findings of untrustworthiness for cases involving records that are nonroutine, prepared in anticipation of litigation, or otherwise suggest the existence of a motive and opportunity to falsify. *See, e.g., Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258-59 (9th Cir. 1984). *Compare U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1044 (9th Cir. 2009) ("There is no merit to Lumbermens argument that the exhibits constitute evidence prepared solely for the purposes of litigation and not kept in a company's regular course of business. . . . [T]he company in this case kept the computerized database in the regular course of

business and regularly compiled summaries of payment histories in the regular course of business.").

SESH has not met its burden of showing the invoices are untrustworthy—it has not shown the invoices reflect nonroutine activity, were prepared in anticipation of litigation, or were falsified. The primary reason SESH argues the invoices ought to be considered untrustworthy is that the invoices attached to the prior motion bear the address of EMG—an entity that was previously the sole manager of SESH—while the invoices attached to the present motion bear SESH's address. (Doc. 233 at 3.) SESH claims that the address on the first set of invoices means they could not have been sent to SESH, as ARS's affidavit states, and further claims that the discrepancy in addresses means one set must be "fake." (Doc. 233 at 4; Doc. 229 at 7.) However, what's at issue in the present motion is the *amount* of damages, and SESH does not seem to genuinely dispute the dollar amounts in the invoices or contend that the figures themselves are untrustworthy. The amount at issue in the invoices is the sort of record upon which ARS would rely in the ordinary course of business, which is the basic foundation for trustworthiness. Finally, SESH's suggestion that a changed address means the invoices are "fake" is conclusory and fails to explain why a discrepancy in addresses necessarily means that the dollar amount SESH owes has been fabricated. Thus, SESH has failed to meet its burden of showing that the invoices are untrustworthy for purposes of Rule 803(6)(E).[5]

III. <u>Breach Of The Implied Covenant Of Good Faith And Fair Dealing</u>

In an attempt to reduce the amount of damages it owes, SESH argues that ARS breached the Billing Agreement's implied covenant of good faith and fair dealing by February 2017, that this constituted a "material" breach, and that SESH was therefore excused from future performance after April 2017. (Doc. 229 at 7-10.) In response, ARS

---

[5] SESH also makes a passing claim that the invoices "do not have circumstantial guarantees of trustworthiness under Rule 807." (Doc. 229 at 7.) However, Rule 807 is a rule that may be invoked by the *proponent* of a hearsay statement when the statement "is not admissible under a hearsay exception in Rule 803 or 804." Here, ARS isn't arguing that the invoices are admissible under Rule 807 and the Court has determined that the invoices are admissible under Rule 803(6). Thus, there is no need to conduct a Rule 807 analysis.

argues that (1) a breach of the implied covenant cannot, as a matter of Arizona law, constitute a material breach that excuses future performance and (2) it did not breach the implied covenant. (Doc. 230 at 11.) As discussed below, SESH has not introduced facts sufficient to allow a reasonable jury to find that ARS breached the implied covenant. Consequently, it is unnecessary to address whether such a breach could ever excuse future performance.

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id*. "The general rule is that an implied covenant of good faith and fair dealing cannot directly contradict an express contract term." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). However, "Arizona law recognizes that a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id*. at 435. That being said, "[i]f contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires." *Sw. Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 838 P.2d 1314, 1319 (Ariz. Ct. App. 1992).

SESH's theory as to how ARS breached the implied covenant can be summarized as follows. First, SESH contends that ARS's performance under the contract failed to meet industry standards because ARS failed to collect reimbursements at the standard rate and billed insurance companies on SESH's behalf at above-market rates. (Doc. 229 at 8-9.) Second, SESH contends that the terms of the contract were structurally unfavorable because ARS did not guarantee results and was SESH's exclusive provider of

reimbursement services (meaning SESH could not take its business elsewhere) and because ARS recovered a higher percentage for recovering amounts that were appealed or redetermined (meaning ARS had an incentive to cause appeals and redeterminations). (*Id.* at 9.) Third, SESH contends that ARS continued sending invoices after being informed that it was in material breach and being told to cease billing activity. (*Id.* at 8.)

At bottom, it appears that SESH found itself stuck in an unfavorable contract and now seeks to use the implied covenant of good faith and fair dealing as an exit hatch. This is improper. The Court previously found that Dr. Baig's assertions were too conclusory to support a finding of a breach of the implied covenant. (Doc. 215 at 11.) The additional evidence now put forth by SESH remains unavailing. Even if the Billing Agreement created suboptimal incentives for ARS, SESH has failed to show that ARS exercised its discretion in a manner that was inconsistent with SESH's reasonable expectations. In fact, ARS appears *not* to have succumbed to the perverse incentives SESH posits in its briefing: only $60,000 or so of the $734,934.03 in commissions and expenses flowed from appeals or redeterminations. (Doc. 230 at 11.)

Moreover, the Billing Agreement contained a clause, entitled "No Guaranteed Results," under which SESH expressly agreed "that ARS (a) has not provided any guarantee of success or of specific results in connection with the performance of the Services, (b) has not provided any representations or warranties regarding the outcome from such Services (including, without limitation, any specific level of claims revenue to be generated . . . therefrom, and (c) is not responsible for any uncollected claims (or portions thereof)." (Doc. 98-4 at 17.) The presence of this clause forecloses SESH from now asserting an implied covenant claim premised on criticisms of ARS's results and performance. *Cf. Bike Fashion*, 46 F.3d at 434 ("[A]n implied covenant of good faith and fair dealing cannot directly contradict an express contract term.").

IV. <u>Other Arguments</u>

Finally, SESH raises two additional arguments in footnotes that will be addressed here for the sake of analytical clarity.

First, SESH claims that the invoices ARS attached to its motion are actually summaries governed by Federal Rule of Evidence 1006. (Doc. 229 at 7 n.2.) To the extent the invoices themselves are summaries—and SESH does not explain why they should be considered summaries—they are nonetheless admissible as business records. *U-Haul*, 576 F.3d at 1046 ("[T]he summaries themselves constituted the business records. They were the writings at issue, not summaries of other evidence. Thus, Rule 1006 does not apply.").

Second, SESH argues that the invoices are inaccurate because some of them charge a lower rate than ARS could have charged under the Billing Agreement. (Doc. 229 at 10 n.3.) The curious upshot of this argument—which appears to be an attempt to forestall summary judgment by creating an issue of fact as to the amount owed—is that it leaves SESH seeking to avoid summary judgment on the ground that it owes *more* than ARS requests. In any event, given the preceding findings, SESH cannot use this discrepancy to dispute that it owes *at least* $734,934.03, plus late fees and interest. Nor does the fact that ARS could have charged more go to the accuracy of the records. The relevant yardstick of accuracy for the invoices is what ARS kept on record, sent to SESH, and relied upon in the ordinary course of business, not conformity to some platonically ideal calculation permitted by the Billing Agreement. SESH, drawing all reasonable inferences in its favor, has not created an issue of material fact that it would be liable to ARS for $734,934.03. It was not incumbent on ARS to foreclose the availability of a higher amount.

Accordingly, **IT IS ORDERED** that:

(1) ARS's motion for partial summary judgment as to the measure of damages (Doc. 224) is **granted**.

(2) The measure of damages is $734,934.03, plus late fees of $73,493.41 and 18% annual interest (as set forth at Doc. 224 at 9-10).

(3) ARS is also entitled to an award of reasonable attorney's fees in accordance with Section 12(e) of the Billing Agreement. (Doc. 98-4 at 22 ["If any legal action . . . is brought in connection with this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees, accounting fees, and other costs incurred in that action or

1 proceeding, in addition to any other relief to which it may be entitled.".)[6]

2     (4)    Pursuant to LRCiv 54.2(b)(2), "the party seeking an award of attorneys' fees and related non-taxable expenses must file and serve a motion for award of attorneys' fees and related non-taxable expenses (along with a supporting memorandum of points and authorities) within fourteen (14) days of the entry of judgment in the action with respect to which the services were rendered."

    (5)    As noted in the Case Management Order (Doc. 189 at 6-7), all motions for an award of attorneys' fees shall be accompanied by an electronic Microsoft Excel spreadsheet, to be emailed to the Court and opposing counsel, containing an itemized statement of legal services with all information required by Local Rule 54.2(e)(1). This spreadsheet shall be organized with rows and columns and shall automatically total the amount of fees requested to enable the Court to efficiently review and recompute, if needed, the total amount of any award after disallowing any individual billing entries. This spreadsheet does not relieve the moving party of its burden under Local Rule 54.2(d) to attach all necessary supporting documentation to its motion. A party opposing a motion for attorneys' fees shall email to the Court and opposing counsel a copy of the moving party's spreadsheet, adding any objections to each contested billing entry (next to each row, in an additional column) to enable the Court to efficiently review the objections. This spreadsheet does not relieve the non-moving party of the requirements of Local Rule 54.2(f) concerning its responsive memorandum.

    …
    …
    …
    …
    …
    …

---

[6] ARS included, in its motion, a request for attorneys' fees pursuant to Section 12(e) of the Billing Agreement. (Doc. 224 at 9.) In its response, SESH acknowledged that request (Doc. 229 at 2) and didn't specifically dispute it.

(6) The Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 5th day of February, 2020.

Dominic W. Lanza
United States District Judge